## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### CASE NO.: _____

BINYAMIN RUTSTEIN; and
EF GROUP HOLDINGS, LLC,

      Plaintiffs,

v.

VIVA 5 GROUP, LLC; MARK JAGGI;
DAVID BUNCH; BRIAN BAER; and
MATT NEWMAN,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiffs Binyamin Rutstein and EF Group Holdings, LLC, for their Complaint against Defendants Viva 5 Group, LLC, Mark Jaggi, David Bunch, Brian Baer, and Matt Newman, allege as follows:

## INTRODUCTION

1.    In exchange for "Tracking Units", Plaintiffs sold their successful vitamin and supplement brand, Nature's Craft, to an entity called Viva 5. Unbeknownst to Plaintiffs, Viva 5 is a fraudulent scheme masterminded by Mark Jaggi and David Bunch who, together with their co-Defendants Brian Baer and Matt Newman, diverted funds from Plaintiffs in order to enrich themselves.

All told, Defendants have misappropriated approximately $17.0 million from Plaintiffs, causing the Tracking Units they gave Plaintiffs to become worthless.

2.     Defendants' scheme works like this. Mr. Bunch and Mr. Jaggi approach successful businesses, offering to help them develop and market new products, with Viva 5 giving them some money in exchange for an equity position in the business. After a brief meeting or two and the exchange of some preliminary financial information, the tone changes, and Mr. Bunch and Mr. Jaggi offer a different sort of deal. One where Viva 5 will acquire the entire business, buying out all of the existing partners in the process. It's a pressure cooker of an offer because it anticipates closing in sixty days. And here's the catch: while some portion of the buyout might be paid in cash, the bulk will be paid in the form of "Tracking Units."

3.     Tracking Units are a special type of stock issued by a company to represent a particular division or segment of the business. They are typically created for investors who want to value specific aspects of larger enterprises on different terms than the larger enterprise as a whole. Tracking Units hit their heyday in the 1990s, the result of management teams trying to cash in on subsidiary valuations that, during the dot-com bubble, hit new highs on an almost daily basis.

4.      WorldCom is the most famous example of how tracking stocks can be abused. In March 2003, a special investigative committee for the board of directors of WorldCom, Inc. published a report of its investigation into what was, at the time, the largest financial fraud in history.[1] That was the one where,  according to the report, "more than $9 billion in false or unsupported accounting entries were made in WorldCom's financial systems in order to achieve desired reported financial results."

5.      Critical to the success of the WorldCom scheme, the report continues, was the "formation of two tracking stocks." Indeed, while CEO Bernard Ebbers publicly claimed that the dual-stock system enabled "the respective businesses to achieve greater management and resource focus," a closer look revealed a darker truth. One exposing the use of tracking units as a form of "financial engineering" where, by putting poorly operating businesses—the "dogs and cats"—into one class of stock, executives could show double-digit revenue growth in the other. Or, as described by a more forthright employee, the use of tracking stock was the equivalent of "put[ting] manure in the closet."

6.      Viva 5 operates in much the same way as WorldCom.

---

[1]      Securities and Exchange Commission, Report of Investigation by the Special Investigative Committee of the Board of Directors of WorldCom, Inc., dated March 31, 2003, available at https://www.sec.gov/Archives/edgar/data/723527/ 000093176303001862/ dex991.htm#ex991902_59 (last visited September 13, 2024).

7.     For starters, Viva 5 is in debt. More than $225.0 million in debt. To facilitate the annual payments on its own debts, which exceed $18.0 million, Viva 5 devours profitable businesses and leaves their former owners with worthless Tracking Units. The scheme involves forcing newly acquired entities, like Nature's Craft, to transfer millions of dollars in cash to Viva 5 in the form of "loans." Viva 5 then uses that "up streamed" cash to pay its own substantial debts, while leaving Nature's Craft and other newly acquired entities with insufficient reserves. On top of that, Viva 5 "pushes down" millions of dollars in "losses" to its acquired entities, preventing those entities, like Nature's Craft, from paying a dividend to the holders of its Tracking Units. As a result, the Tracking Units that former owners like Plaintiffs are given in exchange for their business are worthless.

8.     This action is brought by Plaintiffs to recover their losses resulting from the Viva 5 scheme.

## PARTIES AND RELEVANT NONPARTIES

9.     Plaintiff Binyomin Rutstein is a co-founder of the Nature's Craft brand, a United States Citizen, and a resident of Miami-Dade County, Florida.

10.    Plaintiff EF Group is a Delaware Limited Liability Company that holds title to half of the Tracking Units paid by Viva 5 for Nature's Craft. It is owned and managed by a Delaware trust whose sole beneficiary is Mr. Rutstein.

11.     Nonparty Meir Chapler is a co-founder of the Nature's Craft brand and is a resident of Puerto Rico. He holds title to the other half of the Tracking Units paid by Viva 5 for Nature's Craft.

12.     Defendant Viva 5 Group is a Florida Limited Liability Company doing business as Growve. Headquartered is in Pinellas County, Florida, Viva 5 claims to be a "brand accelerator" that acquires and develops companies through a blend of marketing cost reduction strategies.

13.     Defendant Mark Jaggi is the current Chief Financial Officer of Viva 5 and resides in Utah County, Utah. As a defendant in the class action lawsuit styled *Zhang v. LifeVantage Corp., et al.*, No. 16-CV-965 (D. Utah), Mr. Jaggi came under scrutiny for "engag[ing] in a plan, scheme, [or] conspiracy, and course of conduct" whereby he, as CFO of the defendant entity, "operated" a "fraud" in "connection with the purchase and sale of securities."[2] That is his *modus operandi*.

14.     Defendant David Bunch is the current Chief Executive Officer of Viva 5 and resides in Salt Lake County, Utah.

15.     Defendant Brian Baer is a co-founder of Viva 5 and resides in Broward County, Florida.

---

[2]     Complaint, ECF No. 2, p. 12.

16.     Defendant Matt Newman is a co-founder of Viva 5 and resides in Pinellas County, Florida. Mr. Newman served as a member of Viva 5's Board of Directors until December 2023.

## JURISDICTION AND VENUE

17.     This is an action for damages in excess of $17,000,000 as to each Defendant, exclusive of interest, costs, and attorneys' fees.

18.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Defendants are alleged to have violated § 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder. This Court thus has subject matter jurisdiction over the related claims arising under Florida state law pursuant to 28 U.S.C. § 1367. Furthermore, this Court has personal jurisdiction over each Defendant because they are engaged in substantial and not isolated activity within Florida, and because this action arises out of Defendants' tortious acts committed within Florida.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2), because this controversy arose in this District, and because principal place of business of Viva 5, where Defendants Bunch, Jaggi, Baer, and Newman customarily transact business, is located here.

## FACTUAL ALLEGATIONS

### A. THE BUSINESS OF NATURE'S CRAFT

20.     Plaintiff Rutstein is the co-founder of a vitamin and supplement company that sells its products under a label called Nature's Craft. Starting with a single product, available exclusively through Amazon, the Nature's Craft brand is now associated with more than 240 different vitamins and supplements. Products sold under the Nature's Craft label have received in excess of 24,000 customer reviews on Amazon, where the brand enjoys a customer rating of approximately 4.5-stars.

21.     Today, Nature's Craft-branded products can be located on the shelves of superstore retailers like Target, and they can be purchased online through retailers like Walmart and iHerb, as well as Amazon.

22.     The primary operating entity for the Nature's Craft brand is a Florida Limited Liability Company called BioGreen Labs. BioGreen Labs is responsible for acquiring and selling products with Nature's Craft marks.[3]

---

[3]     There are two entities that hold accounts authorized to sell Nature's Craft products on Amazon. One is BioGreen Labs. The other is a Delaware Limited Liability Company called Nature's Design Products. Sales revenue associated with Nature's Craft may thus be generated from two different LLCs but, for accounting purposes, that revenue is consolidated.

23.    Mr. Rutstein and Mr. Meir also founded, in 2014, a Philippines-based entity called Medkisment, Inc. to provide back-office support to BioGreen Labs. By the end of 2021, Medkisment employed approximately thirty individuals with specialties in logistics, market research, product design, and customer service. It was included in the sale of Nature's Craft to Viva 5.

24.    Vitamins and supplements sold under the Nature's Craft label have long generated meaningful profits for the brand's owners. In 2020, for example, sales generated from Nature's Craft-labeled products were $18.8 million, resulting in profits of $6.9 million. And in 2021, both measures of financial success continued to rise, with sales reaching $25.0 million, and profits exceeding $8.3 million.

25.    Convinced that the Nature's Craft brand could continue to grow with the help of the right strategic partner, it was in early 2021 that Mr. Rutstein began searching for one with the requisite level of expertise. That search led Mr. Rutstein to Viva 5.

B.  INITIATION OF THE VIVA 5 SCHEME

26.    Defendants began negotiations to acquire the Nature's Craft brand in May 2021. Viva 5's promotional materials, transmitted to Plaintiffs via email, touted Viva 5's expedited process for identifying and acquiring businesses.

Indeed, Viva 5 promised the entire transaction would, soup-to-nuts, take only eight weeks:



27.     Defendants made acquisition decisions quickly because they cared not at all about the operations of businesses being acquired. For Defendants, the sole consideration was that the business be profitable and cash rich, so that Viva 5 could in turn satisfy its own debt payments and loan covenants.

28.     That is why, a couple weeks after the initial meeting, on May 21, 2021, Mr. Bunch submitted a letter of intent for Viva 5 to acquire the entire operation associated with Nature's Craft. Giving Nature's Craft a $28 million valuation, Viva 5 sought to close the transaction within sixty days. Plaintiffs and their partner, Mr. Chapler, would receive $12 million in cash on the date of closure. And the $16 million balance due to them would be paid out in the form of Tracking Units.

29.     These Tracking Units would come from "a holding company" to "be formed within [Viva 5]." That holding company, Mr. Bunch claimed, would "hold all [Viva 5] subsidiaries" except for a "select start-up brands that do not currently generate significant" profits. In other words, normal Viva 5 stock would be owned by insiders like Mr. Baer and Mr. Newman, while Plaintiffs and other business owners brought under the Viva 5 umbrella would receive something quite different, a mere slice of the pie associated solely with the brand they had sold to Viva 5.

30.     Mr. Bunch promised big returns on these Tracking Units. As a "show of [Viva 5's] confidence in the value of the [Viva 5] platform", Mr. Bunch claimed that upon a future sale of Viva 5, Viva 5's subsidiaries—the ones associated with Tracking Units—would each receive independent valuations. And then, so long as the Nature's Craft brand had increased its profits over time, Plaintiffs would be entitled to share in the corresponding appreciation in value associated with Nature's Craft.

31.     Following a brief negotiation period, Plaintiffs and Mr. Chapler agreed to sell the Nature's Craft brand to Viva 5. The final valuation of the brand was $23.0 million. As a result of the sale, Plaintiffs and Mr. Chapler received $11.5 million in cash at closing. And the balance due to them, $11.5 million, was paid in the form of Tracking Units. Two types of Tracking Units, actually:

i) $6.9 million in Tracking Units associated solely with the Nature's Craft brand, and ii) $4.6 million in "Class C-2 Units" which are associated with Viva 5 directly.

32.    Critically, the Tracking Units associated with Nature's Craft also carry "distribution rights" that allow Plaintiffs to retain a percentage of the profits generated by Nature's Craft.

33.    The necessary parties signed an Equity Purchase Agreement to finalize the sale of the Nature's Craft brand to Viva 5 on September 17, 2021.

### C. VIVA 5 PLUNDERS NATURE'S CRAFT TO SUPPORT ITS OWN DEBTS

34.    Since that time, Viva 5 has manipulated the finances of Nature's Craft to the detriment of Plaintiffs in three ways: i) reducing the profitability of Nature's Craft by pushing down losses from Viva 5; ii) causing Nature's Craft to lend any cash it generates from operations to Viva 5; and iii) concealing the financials of Viva 5 from Plaintiffs.

i)    <u>Limiting Partner Distributions by Allocating Losses from Viva 5</u>

35.    According to Mr. Jaggi, the Tracking Units affiliated with Nature's Craft allow Plaintiff and Mr. Chapler to receive, as "partners," cash in the form of "distributions." The amount of cash, Mr. Jaggi says, could be up to but no more than 36% of the taxable income recorded by Nature's Craft in a given year. And of that 36%, Plaintiffs and Mr. Chapler were entitled to a mere 30%. Put more simply,

for every $100.00 that Nature's Craft generated in taxable income, Plaintiffs and Mr. Chapler should have ended up with about $10.80 as a distribution.

36.     By way of example of how that was supposed to work using the actual financial results of Nature's Craft, on September 14, 2023, Mr. Jaggi sent an email acknowledging that Nature's Craft had generated taxable income of about $455,000 in July 2023. The amount available for distribution, 36% of $455,000, was approximately $164,000. And of that $164,000, Plaintiffs and Mr. Chapler should have received 30%, or about $49,000, while the remaining 70%, or about $115,000, was supposed to have gone to Viva 5.

37.     The problem for Viva 5 is that Nature's Craft, along with its other acquisitions, are throwing off an insufficient amount of cash to cover Viva 5's own debt payments in addition to the salaries and distributions the Viva 5 executives like Mr. Baer are paying to themselves.

38.     That is why, by the end of 2023, Viva 5 began taking active measures to prevent cash from being paid to Plaintiffs, despite Nature's Craft remaining profitable.

39.     Indeed, from October to November of 2023, Viva 5 made a series of unjustified accounting entries to the "inventory" account of Nature's Craft. Those entries effectively reduced the amount of "taxable income" available for distribution to partners like Plaintiffs and Mr. Chapler. But Viva 5 wasn't done

yet—they had to wipe out all of the income of Nature's Craft to ensure that nothing went to Plaintiffs.

40.     Copying a move from the WorldCom playbook, Viva 5 proceeded to push down in excess of $9.0 million in losses from Viva 5 to Nature's Craft. Those losses, Mr. Jaggi admits, belong to Viva 5, not Nature's Craft.

41.     And the excuses for why Viva 5 would allocate costs like that defy belief. By email dated February 26, 2024, for example Mr. Jaggi went so far as to claim that pushing in excess of $9.0 million in losses from Viva 5 to Nature's Craft would actually benefit Plaintiffs. Because, he said, as a result of those losses Plaintiffs would not have "a taxable gain in 2023." But Plaintiffs, like anyone else, would rather get paid their due than not at all.

42.     It gets worse though. Mr. Jaggi used the same email to let Plaintiffs know that after moving several million in losses down to Nature's Craft, Viva 5 would be contemporaneously upstreaming $1.5 million in cash from Nature's Craft to Viva 5, claiming "we need to do another loan (this time large)." But doing so basically wiped out the cash generated from Nature's Craft's operations that should have, at least in part, gone to Plaintiffs.

43.     Viva 5 has executed a series of similar "loans" over the past three years, causing millions of dollars to be sent to Nature's Craft at a time when Viva 5 appears to have been insolvent. *See* Section C (ii), *infra*.

44.    In apparent attempt to mollify Plaintiffs about the losses being allocated, Mr. Jaggi promised that Plaintiffs and Mr. Chapler that they would nonetheless receive $100,000 in distributions for year-end December 2023. But Plaintiffs objected to that arbitrary amount.

45.    That's when the nonsensical explanations really began to accumulate. Pointing to the fact that Nature's Craft had generated approximately $1.1 million in positive cash flow in January 2024 alone, Plaintiffs asked Mr. Jaggi how the $100,000 distribution had been calculated. Mr. Jaggi responded on February 27, 2024, that "There's no basis for a tax distribution as the loss allocations wipe them out. *I was doing you a favor.*" (emphasis added).

46.    Viva 5 knows that pushing down losses to Nature's Craft is wrong. And they certainly know that there's no such thing as an "accounting favor." That term smacks of fraud. In a subsequent email dated February 29, 2024, Mr. Jaggi admitted as much, acknowledging that "those ultimately responsible for paying off the debt also 'should' get the losses." It is thus undisputed that these losses belong solely to Viva 5, which has "acquired businesses with debt" before selling "those businesses at a loss." There is no legitimate basis to allocate losses associated with Viva 5's speculative and financially ruinous acquisition strategy to Nature's Craft. Yet Viva 5 did so.

47.     Days later, on March 8, 2024, Mr. Jaggi again admitted that Viva 5 would not allow Plaintiffs or Mr. Chapler to be paid anything, even what they were entitled to, because Viva 5 "needs cash again now" despite the fact that Viva 5 "likely won't help you get more cash to eliminate the losses."

48.     All of which begs the question: why was Viva 5 so frantically moving its losses from its books to Nature's Craft, a process the WorldCom fraudsters called "put[ting] manure in the closet"? Mr. Jaggi explains that too. Viva 5 has, apparently, been desperately looking to sell itself and all of its subsidiaries in a "potential deal" that would benefit neither Plaintiffs nor any other Tracking Unit holder, but rather Mr. Jaggi, Mr. Bunch, Mr. Baer and Mr. Newman. They just had to clean up the business of Viva 5.

49.     Perhaps most damning of all is Mr. Jaggi's assertion from March 14, 2024, that the losses being pushed down "may be bad news for you all – but nothing to be done there." These people are supposed to be fiduciaries for Plaintiffs' interests.

50.     Instead, w Viva 5 is doing is accounting fraud, manipulating its own financials to the detriment of Tracking Unit holders like Plaintiffs. That's wrong.

ii) Causing Nature's Craft to Lend Viva 5 Money

51.     To be clear: Viva 5 requires more cash to pay its own debts it is otherwise entitled to as a "partner" in Nature's Craft. Or any of its other businesses, for that matter.

52.     So whenever it needs more cash, Viva 5 simply causes its profitable "partners", like Nature's Craft, to "lend" Viva 5 some money. Significant amounts of money, in fact.

53.     Contemporaneous to the September 2023 distribution, for example, Viva 5 identified a "large balance of cash" sitting in an account belonging to Nature's Craft. Claiming that Nature's Craft couldn't "do anything with [the cash] at the moment" Mr. Jaggi caused the entire balance—$1 million—to be transferred to Viva 5 as a "Loan."

54.     Same thing happened in March 2024. *See* Section C (ii), *supra*.

55.     In total, Viva 5 has caused Nature's Craft to transfer approximately $8.5 million in cash to Viva 5 in the form of "loans." Yet Viva 5 has no ability to repay those "loans." Nor does it intend to.

iii) <u>Refusal to Provide Books and Records</u>

56.     According to the September 17, 2021 Equity Purchase Agreement where Plaintiffs sold Nature's Craft to Viva 5, the Tracking Units Plaintiffs received in exchange, including the "Class C-2" Tracking Units in Viva 5, were "issued" "pursuant" to Viva 5's "Third Amended and Restated Operating Agreement." That Operating Agreement provides that each member, including Plaintiffs, is entitled to receive annual "audited consolidated balance sheets and income statements", and monthly statements of operations and of cash flows, for Viva 5 "and its Subsidiaries."

57.     Yet Plaintiffs have repeatedly been denied access to financial information associated with Viva 5. On December 21, 2023, for example, Plaintiffs submitted a formal request to Viva 5 pursuant to section 605.0410(2)(a), Florida Statutes, which allows any member to inspect the books and records of their limited liability company. In that request, Plaintiffs sought basic financial data — balance sheets, and a profit and loss statement — for Viva 5 and its subsidiaries. They also requested information pertaining to Viva 5's debts, its relationship with Truist, and its relationship with a private equity group called Palm Beach Capital.

58.     It isn't like the information sought is a secret. Back when the Equity Purchase Agreement was signed, in September 2021, Viva 5 provided Plaintiffs with both a balance sheet and a profit and loss statement.

59.     But after receiving Plaintiffs' request in 2023, Mr. Jaggi has continued to claim that Plaintiffs are no longer entitled to financial information concerning Viva 5.

### D. VIVA 5 EXECUTIVES ENGAGE IN SELF-DEALING TRANSACTIONS

60.     Not satisfied with plundering Viva 5's Tracking Unit subsidiaries, Mr. Jaggi, Mr. Bunch, Mr. Baer, and Mr. Newman have also engaged in self-dealing transactions to the detriment of their "partners", like Plaintiffs.

61.     Shine Armor is a prime example. Using cash from the "loans" Viva 5 forced Nature's Craft to extend, Viva 5 acquired a company called Shine Armor. Upon information and belief, the purchase price Viva 5 paid for Shine Armor was more than $10.0 million dollars.

62.     In December 2023, Viva 5 announced that it would be transferring *the equity* of Shine Armor to Mr. Newman, an insider, for approximately $400,000. Never did Viva 5 offer the equity of Shine Armor to Plaintiffs, nor was it offered to any other Viva 5 "partner" or Tracking Unit holder.

63.     To the contrary, Plaintiffs were told that the *liabilities* of Shine Armor, as well as liabilities of Viva 5 associated with any loss on the sale of the equity of Shine Armor to Mr. Newman, were going to be spread between Plaintiffs and the other holders of Viva 5 Tracking Units. In other words, Mr. Newman

would be receiving a boon while Tracking Unit holders would be forced to pick up the tab.

64. When Plaintiffs and the other Tracking Unit holders learned about Viva 5's plan, they demanded answers. Like, on December 15, 2023, when they asked pointed questions seeking "some details on the Shine acquisition and sale of Shine Armor," and wanted to know things like "the net loss" to Viva 5 and "how much debt" Viva 5 was going to force on Nature's Craft and other Tracking Unit holders because of Viva 5's "poor investment decisions."

65. In response, Mr. Jaggi, on December 19, 2023, claimed that Tracking Unit holders would only ever be provided "a limited amount of information in order to not take up too much time." And he claimed that if any other Tracking Unit holders wanted to buy Shine Armor, they "should talk immediately."

66. But that never happened. Instead, two days later, Viva 5 closed on the sale of Shine Armor to Mr. Newman without involving any other Tracking Unit holders. Mr. Newman left Viva 5 shortly thereafter.

### E. ALL TRACKING UNITS ASSOCIATED WITH VIVA 5 ARE WORTHLESS

67. Viva 5 vacuums up profitable businesses to feed its own substantial debts. In return for Tracking Units, Viva 5 takes over control of those companies' cash and forces them to make substantial multi-million dollars loans to Viva 5 — loans that Viva 5 has neither the ability nor the intention to repay.

68.     The Tracking Units Plaintiffs have received in exchange for Nature's Craft, both types, have no value. Viva 5 has taken overt actions to prevent Plaintiffs from receiving any distributions from their Tracking Units, including the inappropriate push-down of more than $9.0 million in losses from Viva 5, as well as the depletion of cash reserves generated from the operations of Nature's Craft. And to make matters worse, Viva 5 has decided to conceal its financial records from Plaintiffs and the other holders of Viva 5 "Class C-2" stock.

69.     Under these circumstances, Plaintiffs have suffered and will continue to suffer harm as a result of Defendants' actions.

## COUNT I – CONSTRUCTIVE FRAUD
### (Against All Defendants)

Plaintiffs incorporate by reference paragraphs 1 through 69 as though set forth fully herein.

70.     Plaintiffs sold their interest in Nature's Craft to Defendants in exchange for cash and two types of Tracking Units: i) Tracking Units associated solely with the Nature's Craft brand, and ii) "Class C-2 Units" which are associated with Viva 5 directly.

71.     Both types of Tracking Units derive value from Defendants' actions, with Defendants acting as fiduciaries for Plaintiffs' interests.

72.    Plaintiffs can only be paid distributions from the Tracking Units associated with Nature's Craft when the Nature's Craft brand is profitable and when Nature's Craft has cash to pay.

73.    As fiduciaries, Defendants are responsible for, *inter alia*, making decisions to maximize value for Tracking Unit holders and for making distributions when the operations of Nature's Craft dictate that they should.

74.    The fiduciaries here took advantage of their relationship with Plaintiffs and manipulated Nature's Craft and the Tracking Units involved for the exclusive benefit of Viva 5 and its executives, and to the detriment of Plaintiffs. Defendants employed three mechanisms to accomplish this: i) pushing down losses from Viva 5 to reduce the profitability of Nature's Craft; ii) removing cash generated from Nature's Craft by making loans to Viva 5 that Defendants do not have the ability or intent to repay; and iii) engaging in self-dealing transactions like Shine Armor.

75.    Aggregate losses pushed down from Viva 5 from Nature's Craft exceed $9.0 million, while the total balance of loans due from Viva 5 to Nature's Craft exceeds $8.5 million. Upon information and belief, losses associated with the Shine Armor transaction are in excess of $10.0 million.

76.     Defendants executed these improper transactions to make Viva 5 seem more profitable and successful than it was, and to continue to make Viva 5's own debt payments that it otherwise would have been unable to afford.

77.     Plaintiffs, as Tracking Unit holders, have suffered substantial injury as a result of Defendants' improper abuse of their fiduciary relationship.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages in an amount to be determined at trial together with pre- and post- judgment interest at the maximum rate allowable by law, an accounting, attorneys' fees and costs, and such other and further relief as this Court may deem just and proper.

## COUNT II – FRAUDULENT INDUCEMENT
### (Against All Defendants)

Plaintiffs incorporate by reference paragraphs 1 through 69 as though set forth fully herein.

78.     In early 2021, when Plaintiffs were actively seeking a business partner to help facilitate growth within Nature's Craft, they were approached by Mr. Jaggi, and Mr. Bunch with a proposal from Nature's Craft.

79.     Claiming to be a "brand accelerator" with experience acquiring and developing companies through a blend of marketing cost reduction strategies, Viva 5 sought some preliminary financial information from Nature's Craft.

80.     Viva 5, though, was really only concerned with one thing: the earnings before interest, taxes, depreciation, and amortization ("EBITDA") associated with Nature's Craft. To be able to pay its own debt payments as they become due, Viva 5 had to purchase more and more companies with positive EBITDA and then cannibalize the cash reserves of those companies for the benefit of Viva 5 and its owners.

81.     Nature's Craft fit squarely within Viva 5's needs. So it made an offer to acquire the entire business. But Viva 5 did not have $23.0 million to pay the agreed upon purchase price. Instead, Viva 5 offered to buy Nature's Craft for some cash plus two types of Tracking Units: i) Tracking Units associated solely with the Nature's Craft brand, and ii) "Class C-2 Units" which are associated with Viva 5 directly.

82.     Mr. Jaggi and Mr. Bunch materially misrepresented the facts associated with those Tracking Units. There was zero prospect of the Tracking Units associated with Nature's Craft appreciating in value—or even retaining their stated value at the time Nature's Craft was sold—because Viva 5 took overt actions to destroy the value of those Units. That was accomplished in three ways: i) pushing down losses from Viva 5 to reduce the profitability of Nature's Craft; ii) removing cash generated from Nature's Craft by making loans to Viva 5 that

Defendants do not have the ability or intent to repay; and iii) engaging in self-dealing transactions like Shine Armor.

83.  Viva 5 and its executives knew that the Tracking Units provided to Plaintiffs in exchange for Nature's Craft were worthless when they were created by Viva 5 in September 2021.

84.  Yet Viva 5 and its executives misrepresented the value of those Tracking Units, at one time promising that Plaintiffs would earn approximately thirteen times the stated value of the Tracking Units. Yet Viva 5 and its executives knew those representations to be false, evidenced by, *inter alia*, Viva 5's subsequent plunder of $8.5 million in cash reserves associated with Nature's Craft, and the self-dealing transactions like Shine Armor.

85.  Viva 5, in fact, had no intention of creating value for Plaintiffs as holders of Nature's Craft Tracking Units. Rather, Viva 5 was only interested in rapidly buying and selling companies for quick gains or losses—mainly losses—through a process called EBITDA arbitrage.

86.  Plaintiffs relied on Defendants' misrepresentations and sold Viva 5 their successful business, Nature's Craft, in exchange for worthless Tracking Units.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages in an amount to be determined at trial together with pre- and post- judgment interest at the maximum rate allowable by law, attorneys' fees

and costs, and such other and further relief as this Court may deem just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY
(Against All Defendants)

Plaintiffs incorporate by reference paragraphs 1 through 69 as though set forth fully herein.

87. Plaintiffs sold their interest in Nature's Craft to Defendants in exchange for cash and two types of Tracking Units: i) Tracking Units associated solely with the Nature's Craft brand, and ii) "Class C-2 Units" which are associated with Viva 5 directly.

88. Both types of Tracking Units derive value from Defendants' actions, with Defendants acting as fiduciaries for Plaintiffs' interests.

89. Plaintiffs can only be paid distributions from the Tracking Units associated with Nature's Craft when the Nature's Craft brand is profitable and when Nature's Craft has cash to pay.

90. As fiduciaries, Defendants are responsible for, *inter alia*, making decisions to maximize value for Tracking Unit holders and for making distributions when the operations of Nature's Craft dictate that they should.

91. The fiduciaries here took advantage of their relationship with Plaintiffs and manipulated Nature's Craft and the Tracking Units involved for the exclusive benefit of Viva 5 and its executives, and to the detriment of Plaintiffs.

25

Defendants employed three mechanisms to accomplish their improper manipulation: i) pushing down losses from Viva 5 to reduce the profitability of Nature's Craft; ii) removing cash generated from Nature's Craft by making loans to Viva 5 that Defendants do not have the ability or intent to repay; and iii) engaging in self-dealing transactions like Shine Armor.

92.    Aggregate losses pushed down from Viva 5 from Nature's Craft exceed $9 million, while the total balance of loans due from Viva 5 to Nature's Craft exceeds $8.5 million. Upon information and belief, losses associated with the Shine Armor transaction are in excess of $10.0 million.

93.    Defendants executed these improper transactions to make Viva 5 seem more profitable and successful than it was, and to continue to make Viva 5's own debt payments that it otherwise would have been unable to afford.

94.    Plaintiffs, as Tracking Unit holders, have suffered substantial injury as a result of Defendants' improper abuse of their fiduciary relationship.

95.    WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages in an amount to be determined at trial together with pre- and post- judgment interest at the maximum rate allowable by law, an accounting, attorneys' fees and costs, and such other and further relief as this Court may deem just and proper.

## COUNT IV – VIOLATIONS OF SECTION 10(b)
## OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5
(Against All Defendants)

Plaintiffs incorporate by reference paragraphs 1 through 69 as though set forth fully herein.

96.   This is claim for violations of Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder.

97.    In exchange for their brand, Nature's Craft, Defendants offered Plaintiffs approximately $23.0 million. Defendants promised to pay Plaintiffs with a blend of cash and a form of stock called a Tracking Unit.

98.   In order to get Plaintiffs to accept Tracking Units in lieu of cash, Viva 5 and its executives intentionally misrepresented the value of those Tracking Units, at one time promising that Plaintiffs would earn approximately thirteen times their initial stated value.

99.   Yet Viva 5 and its executives knew those representations to be false, evidenced by, *inter alia*, Viva 5's subsequent plunder of $8.5 million in cash reserves associated with Nature's Craft and the fact that instead of supporting the value of Nature's Craft, Viva 5 inappropriately pushed down more than $9.0 million in unjustified losses to Nature's Craft.

100.   Viva 5, in fact, had no intention of creating value for Plaintiffs as holders of Nature's Craft Tracking Units. Rather, Viva 5 was only interested in

rapidly buying and selling companies for quick gains or losses—mainly losses—through a process called EBITDA arbitrage.

101.    Unaware that Defendants' representations were false—knowingly so—Plaintiffs accepted Tracking Units in exchange for their valuable Nature's Craft brand.

102.    The Tracking Units Plaintiffs received in that transaction are worthless.

103.    As Tracking Unit holders, Plaintiffs have thus suffered substantial injury as a result of Defendants' material misrepresentations.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages in an amount to be determined at trial together with pre- and post- judgment interest at the maximum rate allowable by law, attorneys' fees and costs, and such other and further relief as this Court may deem just and proper.

## COUNT V – VIOLATIONS OF THE FLORIDA
## SECURITIES AND INVESTOR PROTECTION ACT
(Against All Defendants)

Plaintiffs incorporate by reference paragraphs 1 through 69 as though set forth fully herein.

104.    This is a Florida Securities and Investor Protection Act claim arising under sections 517.301 and 517.211, Florida Statutes.

105.    In exchange for their brand, Nature's Craft, Defendants offered Plaintiffs approximately $23.0 million. Defendants promised to pay Plaintiffs with a blend of cash and a form of stock called a Tracking Unit.

106.    In order to get Plaintiffs to accept Tracking Units in lieu of cash, Viva 5 and its executives negligently misrepresented the value of those Tracking Units, at one time promising that Plaintiffs would earn approximately thirteen times their initial stated value.

107.    Yet the representations made by Viva 5 and its executives were false, evidenced by, *inter alia*, Viva 5's subsequent plunder of $8.5 million in cash reserves associated with Nature's Craft and the fact that instead of supporting the value of Nature's Craft, Viva 5 inappropriately pushed down more than $9.0 million in unjustified losses to Nature's Craft.

108.    Viva 5, in fact, had no intention of creating value for Plaintiffs as holders of Nature's Craft Tracking Units. Rather, Viva 5 was only interested in

rapidly buying and selling companies for quick gains or losses—mainly losses—through a process called EBITDA arbitrage.

109.   Unaware that Defendants' representations were false, Plaintiffs accepted Tracking Units in exchange for their valuable Nature's Craft brand.

110.   The Tracking Units Plaintiffs received in that transaction are worthless.

111.   As Tracking Unit holders, Plaintiffs have thus suffered substantial injury as a result of Defendants' negligent misrepresentations.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages in an amount to be determined at trial together with pre- and post- judgment interest at the maximum rate allowable by law, attorneys' fees and costs, and such other and further relief as this Court may deem just and proper.

## COUNT VI – NEGLIGENCE
(Against Mr. Bunch)

Plaintiffs incorporate by reference paragraphs 1 through 69 as though set forth fully herein.

112.   By virtue of his role as Chief Executive Officer of Viva 5, Mr. Bunch owes a duty of care to Nature's Craft as a subsidiary of Viva 5.

113.   Due to relationship between Plaintiffs and Viva 5, where Plaintiffs' interest in Nature's Craft is in the form of Tracking Units, Mr. Bunch had a duty

to exercise reasonable skill and ordinary diligence in handling Plaintiffs' investment.

114. Mr. Bunch breached his duty to Plaintiffs by allowing Mr. Jaggi, Mr. Baer, and Mr. Newman to misappropriate and misuse Nature's Craft as a dumping ground for Viva 5's losses, allowing them to siphon cash away from Nature's Craft with no intent or ability to repay that cash, and permitting self-dealing transactions, like Shine Armor.

115. As a result of the breach of his duty, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Mr. Bunch for compensatory damages in an amount to be determined at trial together with pre- and post- judgment interest at the maximum rate allowable by law, attorneys' fees and costs, and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 18, 2024.  Respectfully submitted,

DIAZ REUS & TARG, LLP
100 Southeast Second Street, Suite 3400
Miami, Florida 33131
Telephone (305) 375-9220

By: /s/ *Michael Diaz*
Michael Diaz, Jr. (Florida Bar No. 606774)
Email: mdiaz@diazreus.com
Ishmael Green (Florida Bar No. 109100)
Email: igreen@diazreus.com
Brant C. Hadaway (Florida Bar No. 494690)
Email: bhadaway@diazreus.com